Minute Order Form (06/97)



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4989 | **DATE** | 3/30/2004 |
| **CASE TITLE** | | JOY vs. HAY GROUP INC | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    ENTER MEMORANDUM OPINION AND ORDER: The Court: (1) grants in part and denies in part Plaintiff's motion to strike portions of HGI's LR 56.1 submissions [doc. no. 79-1]; (2) denies Plaintiff's motion to strike HGB's LR 56.1 submissions [66-1]; (3) denies Plaintiff's motion for summary judgment [60-1]; (4) grants HGI's summary judgment motion [54-1]; and (5) grants HGB's summary judgment motion [57-1]. This case is hereby terminated. All pending motions are dismissed as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | MAR 31 2004 | | 92 |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | | | date mailed notice | | |
| CG | courtroom deputy's initials | | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LYNN A. JOY,                                        )
                                                    )
        Plaintiff,                               )
                                                    )
        v.                                       )        Judge Ronald A. Guzmán
                                                    )
HAY GROUP, INC., a Delaware                         )        02 C 4989
corporation, and HG (BERMUDA)                       )
LIMITED, a Bermuda limited liability                )
company,                                            )
                                                    )
        Defendants.                              )

## MEMORANDUM OPINION AND ORDER

In this diversity case, Lynn Joy has sued Hay Group, Inc. ("HGI"), a Delaware corporation, and HG (Bermuda) Limited ("HGB"), a Bermuda limited liability company, for breach of contract, violation of the Illinois Wage Payment and Collection Act, 820 ILL. COMP. STAT. 115/1 *et seq.*, violation of the Attorneys' Fees in Wage Actions Act, 705 ILL. COMP. STAT. 225/1, and for a declaratory judgment pursuant to 28 U.S.C. § 2201 regarding her rights after termination with regard to HGB. Pending before the Court are the parties' cross-motions for summary judgment and Plaintiff's motions to strike. For the reasons provided in this Memorandum Opinion and Order, the Court: (1) grants in part and denies in part Plaintiff's motion to strike portions of HGI's LR 56.1 submissions; (2) denies Plaintiff's motion to strike HGB's LR 56.1 submissions; (3) denies Plaintiff's motion for summary judgment; (4) grants HGI's summary judgment motion; and (5) grants HGB's summary judgment motion.

DOCKETED
MAR 31 2004

92

On April 26, 1996, HGI, a Delaware corporation based in Philadelphia, Pennsylvania and doing business in Illinois, hired Hay, a resident of Illinois, as a Senior Consultant in HGI's Executive Compensation Practice pursuant to an offer letter signed and agreed to by Joy ("Offer Letter"). (Pl.'s LR 56.1(a)(3) ¶¶ 1, 2, 11.) The Offer Letter provided for a guaranteed bonus for fiscal year 1996 of $69,750. (Pl.'s Ex. A, Letter from HGI to Hay of 4/26/96 ("Offer Letter") ¶ 2.) Thereafter, her bonus payments were to be as follows:

> Each Fiscal Year (beginning October 1), you and I will agree on an Annual Performance Plan with defined objectives and potential incentive payouts based on your responsibilities as a Senior Consultant in the Executive Compensation Practice. Your total annual incentive target will be equal to 60% of your base salary for all future years; and the range around your incentive target will vary from 30% to 100% of your base salary.

(*Id.*) Although not guaranteed, the Offer Letter contemplated that Hay would consider Joy for Partnership after she completed one year of employment. (*Id.* ¶ 4.) Further, the Offer Letter provided that if HGI "decided to end your employment for reasons other than cause, the severance package will equal one year of base salary plus health benefit continuation." (*Id.* ¶ 5.) The Offer Letter also stated: "The terms and conditions of Hay's employment offer to you are contained in this letter. As we have agreed, this employment offer will apply for the duration of your employment with the Hay Group." (*Id.* ¶ 6.)

In or around October 1998, Joy was nominated and elected to the partnership of HGI. (Def. HGI's LR 56.1(a)(3) ¶ 16.) On January 1, 1999, Joy's base salary was raised to $210,000.00. (*Id.*)

---

[1]The following facts are either undisputed or deemed admitted because the party's statement or response did not refute the other party's statement of fact and/or was unsupported by a citation to the record as required by LR 56.1, which this Court strictly enforces.

2

On October 1, 1999, Joy began an authorized leave of absence for family reasons. (*Id.* ¶ 24.) In March 2000, she returned to work one day per week. (*Id.*) On September 1, 2000, one month prior to the end of fiscal year 2000, she returned to work full time. (*Id.*) Joy received no bonus payment for fiscal year 2000, but she did not complain or object. (*Id.* ¶ 25.) Upon Joy's return from leave, Joy's supervisor suggested to HGI upper management that her billable requirement be adjusted to reflect the unique circumstances resulting from her leave in September 2000, but his suggestion was rejected. (Pl.'s LR 56.1(b)(3)(B) ¶ 10.)

HGI has a Senior Incentive Plan ("SIP"), which is also known as the Hay Group Senior Executives' Profit Sharing Plan ("SEPS") (collectively "the Plan"), under which the Chairman of HGI's Board of Directors with the advice of the Board has discretion to interpret the Plan and make all determinations necessary for the administration of the Plan. (HGI's LR 56.1(a)(3) ¶ 18.) The Executive Committee of the Board determines eligibility and awards bonuses in accordance with the Executive Committee's perception of the participant's ability to contribute to HGI's long-term profit and growth objectives. (*Id.* ¶ 19.) Payment of bonuses under the Plan was conditioned on the participant's remaining employed with HGI through the end of the applicable award period. (*Id.* ¶ 21.) The award period under the Plan coincides with HGI's fiscal year, which runs from October 1 to September 30. (*Id.* ¶ 20.) Joy disputes that her bonus payments are governed by the Plan and argues that the terms and conditions of her employment are governed solely by the Offer Letter. (*See* Pl.'s LR 56.1(b)(3)(A) ¶ 17.)

On March 22, 2001, Matthews sent Joy a summary of her SIP and related incentive information for fiscal year 2001. (Def. HGI's LR 56.1(a)(3) ¶ 26.) The summary stated that incentive opportunities under the 2001 SIP consisted of three components: (1) performance of the

3

United States operations; (2) worldwide profit share; and (3) a discretionary component allocated by the Executive Committee based on individual performance. (*Id.*) The summary also provided that the Chief Executive, Chris Matthews, would have discretion to withdraw all three elements of a participant's opportunity if he or she did not perform at the level expected of a participant. (*Id.* ¶ 27.)

In Spring 2001, Webb Bassick, Joy's supervisor, took her on a business development trip to Texas and told her to help him respond to a proposal for Cooper Industries that was generated as a result of the trip. (*Id.* ¶ 29.) Bassick criticized Joy for her failure to follow up on the Cooper proposal, and he eventually gave the project to someone else. (*Id.*) On May 23, 2001, Bassick stated to another HGI executive that "[t]hings are not progressing well with [Joy]," and that he had "written [Joy] out" of projects because of her failure to follow up on them. (*Id.*) He stated: "I think we are at the point where I need to be very directive in terms of [Joy's] performance, or lack thereof, and a time period for turning it around." (*Id.*)

On August 20, 2001, HGI gave Joy a written performance warning, which she signed to acknowledge her receipt and understanding of the notice, regarding her "continuing performance issues" relating to billing and utilization, *i.e.*, the percentage of time she spent on billable work. (*Id.* ¶ 32.) The warning stated: "[Y]our utilization rate is 13.1% and your billings are $117,300. This performance is unacceptable for someone at your level. As a Partner, you should be at a utilization rate of 40% and have annualized billings of $475,000." (*Id.* ¶ 33.) Joy was given ninety days to raise her billing level to a reduced annualized rate of $398,000 and was warned that failure to do so could result in termination. (*Id.* ¶¶ 34, 35.)

During the ninety-day period ending in November 2001, Joy attained her billable hours. (*Id.* ¶ 36.) However, Joy subsequently failed to attain the 40% utilization rate requirement in December (she attained a .9% rate) and January (8.4% rate) and concedes that her annualized billable time was below $398,000 after November 2001, but she argues that she felt she was not required to maintain the utilization rate or annualized billable standard beyond the ninety-day performance warning period. (*Id.* ¶ 36; *see* Pl.'s LR 56.1(b)(3)(A) ¶ 36[2]; Joy Dep. at 144:7-10, 146:8-10.)

On February 25, 2002, Joy received a second performance warning that stated she had not sustained acceptable billable hours and utilization rates since November 2001. (HGI's LR 56.1(a)(3) ¶ 38.) The second warning stated:

> Effective immediately, you are being placed on notice and given thirty (30) days to achieve the business target associated with your role, including getting your utilization level to 40% with annualized personal billings up to an annualized rate of $398,000.
>
> . . . . If you are unable to achieve these performance levels within the next 30 days, or if you achieve but fail to sustain these performance levels, then further disciplinary action will be considered, up to an [sic] including termination of employment.

(HGI's Ex. H.) Joy made handwritten changes to the warning to reflect her understanding from her own records of what utilization rates and billable hours she had attained as well as what she believes should have been expected of her. (*Id.*; HGI's LR 56.1(a)(3) ¶ 39[3]; Joy Dep. at 157:9- 163:7.) She

---

[2]Joy denies the second sentence in HGI's paragraph 30 of its LR 56.1(a)(3) submission that states: "After November, however, she failed to maintain a satisfactory level of performances, posting a .9% utilization rate in December 2001 and an 8.4% utilization rate in January 2002." However, her denial is unsupported by the record because neither her citation to her deposition or to Bassick's affidavit addresses her utilization rates in December 2001 and January 2002. Accordingly, paragraph 30 is deemed admitted.

[3]Although Joy denies paragraph 39 of HGI's LR 56.1(a)(3) statement of facts, her citation to her deposition testimony does not support the denial, and her statements in response are

wrote on the warning memorandum provided to her that her utilization targeted goal should have been 33% instead of the 40% that HGI had required and stated that her actual fiscal year to date utilization rate was 19.8%, instead of the 19.4% figure as stated in the warning. (*Id.* at 163:3-8; HGI's Ex. H.) She wrote on the warning memorandum that her billings for that time period were $81,221.50 (which calculates to $240,818 annualized) and not the $78,922 ($234,000 annualized) figure provided by HGI. (HGI's LR 56.1(a)(3) ¶ 40; HGI's Ex. H.)

Joy failed to achieve the performance goals set forth in the second warning. (HGI's LR 56.1(a)(3) ¶ 41.) Joy achieved billable hours at a level within a few thousand dollars of the annualized billings required in the second warning. (Pl.'s LR 56.1(b)(3)(B) ¶ 5.) She states that HGI's internal network failed to provide the level of client billable work needed to enable plaintiff to reach the billings set forth in the August 2001 and February 2002 warnings. (*Id.* ¶ 7.)

On April 9, 2002, Gene Bauer, HGI's Managing Director for the Western United States, met with Joy and informed her in writing that her employment was being terminated for cause and stated that she was being terminated due to performance goals that were not achieved. (HGI's LR 56.1(a)(3) ¶ 42; Joy Dep. at 189:15-17.) Joy received all of her salary for work performed through April 9 and all of her accrued vacation pay. (HGI's LR 56.1(a)(3) ¶ 43.) Joy received no severance and no incentive payment or bonus for fiscal year 2002. (*Id.* ¶ 45.)

With regard to motion for summary judgment as to HGI, Joy argues she is entitled to severance pay equal to one year of salary and health benefits as a result of her termination. She argues that she was guaranteed a bonus of at least 30% of her salary and that she is entitled to the

---

unresponsive to the statement of fact. Further, her attempt to cite in support of the denial her responses to paragraphs 28 through 38 violates the spirit, if not the letter, of LR 56.1 and accordingly, the Court strikes such statements in response and deems admitted paragraph 39.

difference between 30% of her salary ($63,000) and the bonus she actually received for fiscal year 2001 ($36,000). She also avers she is entitled to a pro rata share of her bonus for the six months she worked for HGI in fiscal year 2002, or 30% of $105,000 (six months of her $210,000 annual salary), which is approximately $31,500. In addition, she states she is entitled to attorney's fees pursuant to the Attorneys Fees in Wage Actions Act, 705 ILL. COMP. STAT. 225/1. HGI has cross-moved arguing that Joy is not entitled to severance, health benefits, any additional bonuses, or attorney's fees.

With regard to her motion for summary judgment as to HGB, Joy seeks a declaratory judgment that HGB's non-competition provision in the Shareholders Agreement is unenforceable as a matter of law and that her termination and/or subsequent employment cannot justify any loss or diminution of her rights under the HGB Shareholders Agreement. HGB has cross-moved arguing lack of personal jurisdiction over HGB,[4] improper venue, lack of ripeness of her claim for loss/diminution of her rights under the Shareholders Agreement, and enforceability of the non-competition clause.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(c), the court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering the evidence

---

[4]Because the Court denied HGB's motion to dismiss for lack of personal jurisdiction with prejudice in its Memorandum Opinion and Order dated September 11, 2003, the Court need not further address the issue.

submitted by the parties, the court does not weigh it or determine the truth of asserted matters. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All facts must be viewed and all reasonable inferences drawn in the light most favorable to the non-moving party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). "If no reasonable jury could find for the party opposing the motion, it must be granted." *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 931 (7th Cir. 1995).

## I. HGI and Joy's Cross-Motions for Summary Judgment Regarding Severance and Bonus

Before discussing the merits of the cross-motions, the Court addresses Joy's motion to strike paragraphs 17-19, 23, 27-29, 31-32, and 50 of HGI's LR 56.1(b)(3)(A) submissions in response to her motion for summary judgment. The motion is granted as to paragraphs 18, 28, 29, 31, and 32 and those statements of fact are deemed admitted. The motion is denied as to paragraphs 17, 19, 23, 27, and 50 because they contain proper denials and are properly supported. However, the Court shall address HGI's legal arguments with regard to Joy's extrinsic evidence.

Moving on to the merits of the cross-motions, Joy argues that HGI violated the Illinois Wage Payment Collection Act and breached an employment contract when it failed to pay her one year's salary as severance and health benefit continuation after her termination. Joy also argues that HGI breached the contract by its failure to pay her a 30% bonus for fiscal year 2001 and a pro rata share of a 30% bonus for fiscal year 2002. HGI argues that she is not entitled to anything more than she received. The Court addresses each argument in turn.

Joy's entitlement to severance and health benefit continuation upon termination hinges on whether the term "cause" in the Offer Letter is ambiguous and whether she was terminated for cause.

8

The pertinent provision of the Offer Letter states: "If Hay group decided to end your employment for reasons other than cause, the severance package will equal one year of base salary plus health benefit continuation." (Pl.'s LR 56.1(a)(3) ¶ 13; Pl.'s Ex. A, Offer Letter ¶ 5.) The term cause was not defined in the Offer Letter. (Pl.'s LR 56.1(a)(3) ¶ 16.) Joy opines that the term "cause" is ambiguous and HGI, of course, disagrees.

Interpretation of a contract, which includes the determination of whether the contract is ambiguous, is a question of law for the court to decide. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). In general, Illinois utilizes a "four corners" rule in contract interpretation. *Id.* "Its purpose is to protect contracting parties from the uncertainty that would attend their obligations if a judge or jury were free to consider evidence that would contradict the terms of a written contract." *Mathews v. Sears Pension Plan*, 144 F.3d 461, 466 (7th Cir. 1998). "In such a regime all contracts would be revisable by judges and juries . . . ." *Id.*

"Under the 'four corners' rule, the threshold inquiry is whether the contract is ambiguous." *Bourke*, 159 F.3d at 1036. "Absent some contrary indication from the terms of the agreement, undefined and unambiguous terms are assigned their plain and ordinary meaning." *First Ins. Funding Corp. v. Fed'l Ins. Co.*, 284 F.3d 799, 804 (7th Cir. 2002). A contract is "deemed ambiguous only if the language of the contract is fairly or reasonably susceptible of more than one construction." *XCO Int'l Inc. v. Pac. Scientific Co.*, 255 F. Supp. 2d 825, 832 (N.D. Ill. 2002).

In limited circumstances, "[e]xtrinsic evidence can be used to show that a contract is ambiguous." *See id.* "The most fundamental of these limitations is that to be admissible to establish an ambiguity, extrinsic evidence must be objective; that is, it must not depend on the credibility of testimony (oral or written) of an interested party--either a party to the litigation or . . . an agent or

employee of the party." *Mathews*, 144 F.3d at 467. This limitation has been extended to testimony of non-parties who "may not be entirely disinterested" and whose "belief as to what the [contract] meant is still inherently difficult to verify." *Am. Nat'l Bank & Trust Co. v. No. Trust Co.*, No. 94 C 6866, 1995 WL 443917, at *5 (N.D. Ill. July 24, 1995). In sum, the extrinsic evidence rules "function as gatekeepers, to prevent a disappointed contract party from ginning up a fishy story about what the contract really meant but didn't say." *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 546 (7th Cir. 2000). Moreover, "[e]xtrinsic evidence should not be used to add terms to a contract that is plausibly complete without them." *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993).

Joy attempts to proffer extrinsic evidence to show that the term "cause" was intended to apply to serious wrongdoing such as misappropriation of Company funds or property, fraud, gross malfeasance or some sort of criminal conduct. (Pl.'s LR 56.1(a)(3) ¶ 25; Pl.'s Ex. 10, Lacey Aff. ¶¶ 5, 6; Pl.'s Ex. 7, Bassick Aff. ¶¶ 5, 6.) The Court rejects Joy's attempt to use extrinsic evidence to add terms to the contract that is plausibly complete without them. The Court finds the contract is complete as it stands because the term "cause" has a plain and ordinary meaning, and Joy is merely asking the Court to create and insert additional terms.

Further, the extrinsic evidence on which Joy relies is precisely the type of evidence prohibited by the extrinsic evidence doctrine. First, Joy relies on her own testimony as to her understanding of the meaning of the term "cause." (Pl.'s LR 56.1(a)(3) ¶¶ 30-33.) Clearly, the Court cannot look to an interested party's own testimony under the extrinsic evidence doctrine.

Second, Joy relies on the affidavit of E. Webb Bassick IV, then Managing Director of HGI's Executive Compensation Practice. (*Id.* ¶¶ 23-29.) Although Bassick no longer works for HGI, he

has sued HGI in another suit alleging he is entitled to one year of base salary plus health benefit continuation based on an identical clause utilizing the term "cause" in Bassick's Offer Letter. (*Hay Group, Inc. v. Bassick*, No. 02 C 8194 (N.D. Ill.); *id.*, Defs.' Second Am. Counterclaims.) Thus Bassick can hardly be deemed a disinterested third party.

Third, Joy relies on the affidavit of David Lacey, then HGI's Vice President of Human Resources. (Pl.'s LR 56.1(a)(3) ¶¶ 23-29.) Joy testified that Lacey left HGI because "he was frustrated with the lack of support he was getting," in particular that he was frustrated with the way Terry Lynch, Managing Director of HGI's North American Operations, did not support him during a compensation project that he had conducted for the North American steering committee, and that Lacey felt "he couldn't work in that kind of environment." (Joy Dep. at 207:23-24- 208:1; *id.* at 208:21-22.) Although Lacey is no longer an employee or agent of HGI and thus is not a party to the instant action, because of Lacey's particular frustration with HGI and his pronounced negative impression of HGI, he cannot be said to be entirely disinterested. Further, his belief as to what the term "cause" means is inherently difficult to verify. Lacey's affidavit does not contain testimony as to custom or trade usage regarding the term "cause," but rather as to the specific meaning of the term in this particular contract. Lacey's affidavit is not the kind of objective testimony that the extrinsic evidence doctrine permits because it depends wholly on the credibility of his testimony.

Fourth, Joy offers as extrinsic evidence a Model Employment Agreement ("MEA") drafted in 2001 that could be used by HGI when it helped clients with various kinds of documents. (Pl.'s LR 56.1(a)(3) ¶¶ 50-51; Joy Dep. at 199:19-20, 200:1-5; Pl.'s Ex. 8, Model Employment Agreement at ¶ 9(b).) The MEA defined "cause" as, among other things, "conviction of a felony, or entering a plea of no contest to a felonious crime in a court of law"; "willfully engaging in one or more acts,

11

or willfully omitting to act in accordance with the Executive's duties hereunder or the general policies and practices of the Company . . . which is demonstrably willful and materially and demonstrably damaging to the Company." (Pl.'s LR 56.1(a)(3) ¶ 50.) However, plaintiff offers no statement of fact averring that the MEA drafted in 2001 used for HGI's clients is in any way relevant to the language used in the Offer Letter drafted in 1996. Paragraphs 50 and 51 of Joy's LR 56.1(a)(3) statement merely iterate the definition of "cause" used in the MEA and state that the MEA was drafted by, not surprisingly, an attorney hired by HGI to assist HGI's executive compensation clients. Joy's deposition testimony does not connect the language used in the Offer Letter to that used in the MEA other than to say that the definition of the term "cause" is different than the one to which she testified earlier in her deposition. Even if Joy had made such a connection, her testimony is exactly the kind of testimony barred by the extrinsic evidence doctrine.

In sum, the affidavits of Joy, Bassick, and Lacey and the existence of a definition of the term "cause" in the MEA do not create a factual issue concerning the existence of an extrinsic ambiguity. Moreover, as stated above, the Court finds no ambiguity in the term "cause." The Offer Letter contains no indication from its terms that would lead to more than one reasonable construction of the term "cause." A "term is not ambiguous because the term is not defined by the [contract] or because the parties can suggest creative possibilities for its meaning." *Lapham -Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 655 N.E.2d 842, 846 (Ill. 1995). Thus, the undefined term of "cause" is assigned its plain and ordinary meaning.

"Cause" is defined as "a reason, motive, or ground for some action." WEBSTER'S NEW WORLD DICTIONARY 223 (3d ed. 1988). Further, the Seventh Circuit has stated that as a matter of law, "[i]nadequate job performance constitutes cause for employment termination." *Geier v.*

*Medtronic, Inc.*, 99 F.3d 238, 244 (7th Cir. 1996) (affirming entry of summary judgment in favor of employer on employee's breach of contract claim based on termination for cause); *see Vandevier v. Mulay Plastics, Inc.*, 482 N.E.2d 377, 381 (Ill. App. Ct. 1985) ("[P]laintiff's satisfactory performance of his duties [is] implicit in the employment relationship . . . ."). Merely because the plain and ordinary meaning of the term "cause" is broad enough to include Joy's definition of the term does not make the term "cause" reasonably susceptible to her crabbed construction. In fact, the opposite is true. The broader the plain and ordinary meaning of a term, the less susceptible it is to an extremely narrow construction. Thus, the Court finds that the term "cause" is not reasonably susceptible to her construction in this case.

Next the Court addresses whether Joy was terminated for cause. It is undisputed that HGI states it terminated Joy's employment because her performance was unsatisfactory in that she failed to maintain the levels of billing, utilization, and sales required of an employee in her position and failed to satisfy performance improvement plans addressing these deficiencies. (Pl.'s LR 56.1(a)(3) ¶ 40.)

HGI states that Joy was expected to generate and maintain certain levels of billings and billable time. (HGI's LR 56.1(a)(3) ¶ 28.) Joy attempts to deny this by pointing to her deposition testimony stating that: (1) when she became partner in the fall of 1998 there were no additional responsibilities put on her; (2) "We were told that we wouldn't have to do business development, per se, because there was a lot of executive compensation work at Hay that wasn't currently being served"; and (3) she was advised in connection with her eligibility for admission to partnership that because she was in the executive compensation practice center, she did not "fit the thumbnail guideline for generation of billable time" and that as a result, the partnership "would look to other

13

criteria." (Pl.'s LR 56.1(b)(3)(A) ¶ 28.) She also points to Bassick's affidavit in which he states: "Mr. Lynch assured me that there was 'plenty of billable work,' and that I, Ms. Joy and Ms. Tapling would not be expected, as part of our responsibilities to HGI, to perform significant sales generation. Instead, our responsibilities were to consist of building a practice which could service work already existing and available to HGI." (*Id.*; Pl.'s LR 56.1(b)(3)(B) ¶ 17.)

Even if the Court views each of Joy's statements in support of her attempted denial as true, as it must, the Court would still grant HGI's motion for summary judgment. Even if she were not required to generate a single penny of her own sales and even if she did not "fit the thumbnail guideline for generation of billable time" and there were no additional responsibilities initially put on her as a result of becoming a partner in 1998, once HGI made it clear to Joy in the August 20, 2001 written performance warning that as a partner she should be performing at a utilization rate of 40% and that within ninety days she was required to have her personal billings up to a reduced annualized rate of $398,000, she was on notice as to what was expected of her and that her performance was not up to snuff because her stated utilization and billing performance over the previous nine months had been 13.1% and $117,000 respectively. Further, the undisputed fact that Joy attained or exceeded her billable hours during the subsequent ninety days establishes that HGI's billable goal was within her reach.

Joy's argument that the August 20 warning did not require her to maintain the minimum level of utilization and billing performance beyond the ninety-day probationary period because the warning did not specifically so state is risible. No reasonable jury could find in her favor in that regard. The August 20 warning made it clear that she was not performing up to the level of a partner and that she was responsible for improving her performance to the stated acceptable level. The

interpretation of that warning as not requiring her to maintain that level is simply unreasonable. If an employer's written expectations of satisfactory performance levels could be so easily undermined and augmented by an errant employee's unreasonable interpretation, one wonders whether any employer could fire an employee for cause without fearing a barrage of litigation.

Even if the Court accepts Joy's performance figures as true, as of February 25, 2004, her actual fiscal year-to-date utilization rate was 19.8% (Joy Dep. at 163:3-8; HGI's Ex. H), and her billings for that time period were $81,221.50 (which calculates to $240,818 annualized). This is a far cry from the 40% utilization rate goal (or even the 33% utilization rate goal Joy would have preferred to have been held to) and the $398,000 annualized billing goal that HGI required of its partners to meet satisfactory performance levels.

After Joy received a second warning on February 25, 2002 that stated she successfully attained or exceeded the minimum level of billings during the ninety-day probationary period but failed to maintain the utilization rate and billings level subsequent to the ninety-day period, she was given thirty days to attain a satisfactory level of performance. She undisputedly failed to do so, missing the mark by a few thousand dollars of the minimum level of annualized billings.

Joy's responses to HGI's statement of facts and her own statement of facts do not raise a genuine issue of material fact with regard to whether she was terminated for cause. Although she states that Bassick, her supervisor, "found the quality of her consulting work to be excellent" (Pl.'s LR 56.1(b)(3)(A) ¶¶ 29-31) and the August 2001 and February 2002 warning memoranda "were not meant to address or criticize the quality of her work" (*id.* ¶ 32), these statements do not preclude summary judgment because HGI did not terminate her for the *quality* of her work, but instead fired her for the *quantity* of her billable work or the lack thereof. (*See, e.g.*, HGI's LR 56.1 ¶ 30 (stating

15

that Joy posted "a .9% utilization rate in December 2001 and an 8.4% utilization rate in January 2002").)

Joy also states that Bassick found her performance in response to the warnings remarkable given the economic climate and in light of HGI's various acts and omissions that made it more difficult for plaintiff to generate billable work. (*Id.* ¶¶ 29-31.) Viewing these facts as true, it is still undisputed that Joy either met or exceeded the minimum annualized billable hours requirement during the ninety-day probationary period following the first warning by asking Bassick to give her some of his work. (HGI's LR 56.1(a)(3) ¶ 36.) There is no statement in the record that establishes that she could not have satisfied her minimum requirements by continuing to ask Bassick for more work during December 2001 through April 2002.

Finally, pretext is not an issue in this case. Joy fails to provide any statement of fact to establish that other employees in her position were not expected to maintain the minimum requirements and were not issued similar warnings or discipline.

Based on the undisputed facts before it and reading all disputed facts in favor of Joy, Joy has failed to raise any genuine issue as to a material fact with regard to each reason HGI gave for her termination. Under the facts presented, reasonable minds could not differ as to whether Joy's failing to maintain the required utilization rate and billings level constitutes cause for termination. Accordingly, she is not entitled to severance pay or health benefits continuation.

Next, the Court addresses whether Joy was guaranteed a bonus of at least 30% of her salary during her employment at HGI regardless of whether she was satisfying her job responsibilities. HGI argues that the Offer Letter did not guarantee Joy a 30% bonus and that her construction of the bonus clause is a patently unreasonable.

As stated above, under Illinois law, a court looks first to the plain language of the contract at issue. *Atl. Mut. Ins. Co. v. Metron Eng'g & Constr. Co.*, 83 F.3d 897, 898 (7th Cir. 1996). "If the contract language is unambiguous and provides an answer to the disputed issue, the court's inquiry is over." *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, No. 98 C 4421, 1999 WL 528499, at *4 (N.D. Ill. July 19, 1999). "As a whole, the primary objective in contract interpretation is to give effect to the intentions of the parties as determined from language of the contract." *Id.*

The Offer Letter stated the following with respect to bonus payments:

**Bonus Payments** - You have an annual incentive opportunity equal to $105,000. For Fiscal Year '96 and assuming a start date of May 1, 1996, your pro-rated incentive opportunity is equal to $43,750. Your pro-rated incentive, plus replacement of your forfeited bonus of $26,000, is guaranteed for the first fiscal year; and the guaranteed amount of $69,750 is payable in December, 1996. This payment will be in a lump sum and you must be an employee of Hay Group, Inc. at the time the incentive award is made.

Each Fiscal Year (beginning October 1), you and I will agree on an Annual Performance Plan with defined objectives and potential incentive payouts based on your responsibilities as a Senior Consultant in the Executive Compensation Practice. Your total annual incentive target will be equal to 60% of your base salary for all future years; and the range around your incentive target will vary from 30% to 100% of your base salary.

(Pl.'s Ex. A, Offer Letter.)

The plain language of the Offer Letter does not guarantee Joy a bonus subsequent to the first fiscal year ending September 30, 1996. The language regarding her bonus for fiscal year 1996 states: "Your pro-rated incentive, plus replacement of your forfeited bonus of $26,000, is *guaranteed* for the first fiscal year; and the *guaranteed* amount of $69,750 is payable in December, 1996." (*Id.* (emphasis added).) In contrast, the language regarding her bonus for years thereafter states: "Each

Fiscal Year (beginning October 1), you [Joy] and I [Bassick] will agree on an Annual Performance Plan with defined objectives and *potential* incentive payouts based on your responsibilities as a Senior Consultant in the Executive Compensation Practice." (*Id.* (emphasis added).) There is a vast difference between a "guaranteed" incentive and a "potential" incentive. Moreover, it is clear from the plain language of the contract that the defined objectives and potential incentive payouts were based on her responsibilities in HGI's Executive Compensation Practice. The Court reads the qualifying or limiting clause "based on your responsibilities" as referring to the next preceding antecedent, and the context of the contract does not require a different construction. *Cf. Bob Willow Motors, Inc. v. Gen'l Motors Corp.*, 872 F.2d 788, 793 (7th Cir. 1989) (citing rule of statutory construction "that qualifying or limiting words or clauses in a statute are to be referred to the next preceding antecedent, unless the context or the evident meaning of the enactment requires a different construction"). Thus, the Offer Letter did not guarantee her a bonus regardless of her responsibilities. Rather, it stated that each year she would have potential incentive payouts based on her responsibilities.

Joy, however, focuses on the language that immediately follows the above language: "Your total annual incentive target will be equal to 60% of your base salary for all future years; and the range around your incentive target will vary from 30% to 100% of your base salary." This language, however, cannot be viewed in a vacuum, and the Court must look at the contract as a whole. The preceding sentence stated that she would have potential incentive payouts based on her responsibilities as a Senior Consultant. That the Offer Letter describes annual incentive targets and target ranges does not negate the fact that the incentive payouts as a whole were merely potential and not guaranteed. The Court finds significant the parties' usage of the word "target" with regard to

18

Joy's future incentives. The plain and ordinary meaning of the word "target" is "an objective" or "goal." WEBSTER'S NEW WORLD DICTIONARY 1369. Thus "target" connotes a prospective matter that is yet to be attained, not something already attained or guaranteed.

Because the plain language of the Offer Letter is unambiguous and provides a clear and resounding "no" answer to the disputed issue whether Joy is entitled to 30% of her base salary, or any pro rata share thereof, the Court's inquiry is over.[5] The Court therefore grants HGI's motion for summary judgment and denies plaintiff's motion for summary judgment with regard to HGI.

## II. HGB and Joy's Cross-Motions for Summary Judgment

Prior to discussing the merits of HGB and Joy's cross-motions, the Court addresses Joy's motion to strike the affidavit of Lois H. Barker pursuant to Fed. R. Civ. P. 37(c)(1). In the alternative she moves to strike paragraphs 9, 19, 21-24, 33, 35, and 42 of Barker's affidavit because they lack of foundation or contain conclusions of law.

Pursuant to Rule 26(a)(1)(A), parties are required to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to the disputed facts." Fed. R. Civ. P. 26(a)(1)(A). "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence . . . on a motion any witness . . . not so disclosed." Fed. R. Civ. P. 37(c)(1). "[T]he sanction is of exclusion is automatic and mandatory unless the sanctioned party can

---

[5]Because Joy strategically chose to put all of her eggs in one basket by maintaining that her entitlement to a minimum bonus of 30% of her base salary arose from terms of the Offer Letter (*see* Pl.'s LR 56.1(b)(3)(A) ¶¶ 17-22; Pl.'s Mem. Opp'n HGI's Mot. Summ. J. at 13-14), she has waived any argument that her entitlement arose under the Senior Incentive Plan, and thus the Court need not address that issue.

show that its violation of Rule 26(a) was either justified or harmless." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid-Am. Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1363 (7th Cir. 1996).

The Court finds informative the Advisory Committee Note regarding Rule 37(c)(1). It states: "Limiting the automatic sanction to violations 'without substantial justification,' coupled with the exception for violations that are 'harmless,' is needed to avoid unduly harsh penalties in a variety of situations: *e.g.*, the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; [or] the failure to list as a trial witness a person so listed by another party . . . ." Fed. R. Civ. P. 37(c)(1) advisory committee's note to 1993 Amendment.

Although HGB failed to list Barker as a witness, HGI and even Joy herself listed her as one. More importantly, Joy served on all counsel of record a notice of deposition demanding that each produce Barker for a deposition to take place on March 29, 2003, but she then opted not to depose Barker. Thus, Joy knew of, and had an opportunity to depose, Barker. Joy had her chance to depose Barker and forwent it. Accordingly, the Court holds that HGB's use of Barker's affidavit results in no prejudice or surprise to Joy. In addition, the Court finds no bad faith or willfulness on HGB's part in not disclosing Barker at an earlier date. Therefore, the Court in its discretion will not strike Barker's affidavit in its entirety.

Barker is a shareholder of HGB and a member of the Ownership Board, which is its governing board of directors. She has been a shareholder in HGB since September 2000 and prior to that she was a partner in its predecessor entity, HG (Bermuda) Exempted Partnership, from its inception in 1990 to September 2000. Barker states that due to her tenure and position with HGB,

she has personal knowledge of HGB's background and the procedures by which it operates. The Court holds that through Barker's position on the governing board of directors, she is qualified to attest to the facts: (1) that the offices of HGB and its predecessor have been maintained and its bank accounts are maintained in Bermuda; (2) that correspondence from HGB originates in Bermuda and most communication directed toward HGB is sent to Bermuda; (3) regarding the existence of a partnership agreement with regard to the HG (Bermuda) Exempted Partnership and the existence of a shareholders agreement with respect to HGB, which are not conclusions of law but state that certain agreements, provisions, and by-laws exist; (4) regarding HG (Bermuda) Exempted Partnership's concern relating to the choice of law and forum clauses; (5) that HGB's primary litigation counsel are located in Bermuda; and (6) regarding HGB's partner selection function and the usual and customary procedures for offering a candidate partnership status. The Court thus denies Joy's motion to strike paragraphs 9, 19, 21-24, 42.

For the same reasons, the Court also denies Joy's motion to strike paragraphs 33 and 35. Further, although Joy argues that Barker's affidavit attempts to set forth unfounded conclusions as to plaintiff's state of mind regarding her acceptance of partnership and shareholder status, the Court disagrees. Barker statements that Joy "opted to accept [partnership] status [in the HG Partnership] and was not required to do so" and "[s]he further elected to continue as a shareholder at the time that HG Partnership was incorporated as HG Bermuda" merely attest to facts within Barker's personal knowledge that are undisputed in the record. It is undisputed that "[i]n or around October 1988, Joy was nominated and elected to the partnership of Defendant HG (Bermuda) Ltd." and that accordingly, her "base salary was raised to $210,000." (*Compare* HGI's LR 56.1(a)(3) ¶ 16, *with* Pl.'s LR 56.1(b)(3)(A) ¶ 16.) It is also undisputed that "Joy executed the Shareholders Agreement"

21

and that she "sent the executed pages to Bermuda in compliance with the requirements to subscribe." (*Compare* HGB's LR 56.1(a)(3) ¶ 40, *with* Pl.'s LR 56.1(b)(3)(A) ¶ 40; *compare* HGB's LR 56.1(a)(3) ¶ 39, *with* Pl.'s LR 56.1(b)(3)(A) ¶ 39.) None of the parties dispute whether Joy was a partner in the HG Partnership or a shareholder in HGB.

In sum, the Court denies Joy's motion to strike. Because her responses to HGB's paragraphs 1-32, 34, 36-38, 41, 43-45 rely solely on her motion to strike Barker's Affidavit and do not deny the factual averments therein, those paragraphs are hereby deemed admitted.

Moving on to the merits of HGB and Joy's cross-motions, the Court first addresses whether Joy's claims against HGB should be dismissed for improper venue. Section 22.1 of the Shareholders Agreement provides: "In respect to any matter brought by any Party concerning this Agreement . . . such party hereby irrevocably submits and agrees to the exclusive . . . venue of the Bermuda courts." (HGI's Ex. 1A, Shareholders Agreement § 22.1.)

The enforceability of a forum-selection provision is a question of law. *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 159 (7th Cir. 1993). "Under Illinois law, a forum selection clause is enforceable except in exceptional circumstances." *Roberts & Schaefer Co. v. Merit Contracting, Inc.*, 99 F.3d 248, 251 (7th Cir. 1996) (citing *Calanca v. D & S Mfg. Co.*, 510 N.E.2d 21, 23 (Ill. App. Ct. 1987)). Those exceptional circumstances include if "enforcement would be unreasonable or unjust or the provision was procured by fraud or overreaching." *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992). "[T]he plaintiff bears the burden of proving that a forum-selection clause is unenforceable." *Cross v. Schneider Fin., Inc.*, No. 01 C 90, 2001 WL 1558297, at *2 (N.D. Ill. Dec. 4, 2001).

"The enforceability of forum selection clauses in international agreements is governed by the Supreme Court's decision in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972)." *Bonny*, 3 F.3d at 159. In *Bremen*, the Supreme Court held that a freely negotiated forum selection clause should control unless there is a showing that "enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Bremen*, 407 U.S. at 15. The *Bremen* Court emphasized that it is "encumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." 407 U.S. at 18. The Court stated "[a]bsent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain." *Id.*

The Supreme Court extended *Bremen*'s holding in *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 592-95 (1991) (hereinafter "*Shute*"). The *Shute* Court held that a nonnegotiated forum selection clause printed in a cruise line's passage contract ticket was reasonable and enforceable. *Id.; see also Northwestern Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 377 (7th Cir. 1990) ("Ours is not a bazaar economy in which the terms of every transaction, or even of most transactions, are individually dickered . . . .").

Following the holding of *Shute*, this Court finds Joy's argument that the forum selection clause in the Shareholders Agreement was not negotiated carries little weight. Further, the record shows that Joy, an accomplished and successful business person, read the Shareholders Agreement before signing it and even had asked questions about other provisions. (Pl.'s Ex. 2, Joy Dep. at 238:6-14.) Thus, similar to the ticket holders in *Shute*, she had notice of the forum selection clause.

23

In addition, as in *Shute*, 499 U.S. at 595, the record shows that Bermuda is not a "remote alien forum" because, like the cruise line whose principal place of business was in Florida and conducted business in Florida, HGB, an entity wholly separate from HGI, is a Bermuda corporation, has its principal place of business in Bermuda, conducts its day-to-day activities in Bermuda, and disseminates any distributions to partners from Bermuda. (*See, e.g.,* HGB's LR 56.1(a)(3) ¶ 41 (stating that when Joy invested in HG Partnership, she directed that her money be mailed or wired to Bermuda).) Thus there is a logical connection between HGB and the forum selected because the performance of its duties under the contract occurred primarily in Bermuda.

Further, there is no evidence in the record to show that HGB set Bermuda as the exclusive forum as a way to discourage shareholders from suing HGB. The record is devoid of any evidence that HGB procured Joy's signing of the Shareholders Agreement, which included the forum selection clause, by fraud or overreaching.

Joy states that she will be unable to pursue a remedy in connection with the Shareholders Agreement and the non-competition obligation if she is required to proceed in Bermuda because she can neither afford the travel expense nor afford to retain counsel in Bermuda. Unfortunately for Joy, her expense and inconvenience of litigating in Bermuda does not rise to the serious level of inconvenience required to meet her heavy burden to set aside the clause. *See, e.g., Grivesman v. Carnival Cruise Lines*, No. 00 C 2091, 2001 WL 62580, at *3 (N.D. Ill. Jan. 25, 2001) (enforcing forum selection clause where pro se plaintiffs residing in Illinois stated that they could not afford to litigate in Florida); *see id.* (stating that "local parties and witnesses can be heard in Florida by deposition"). If the serious inconvenience requirement could be so easily satisfied, the enforcement of forum selection clauses would be a rarity instead of the norm.

24

Finally, the Supreme Court in *Shute* stated that a reasonable forum clause in a form contract may be permissible because the "a cruise line has a special interest in limiting the fora in which it potentially could be subject to suit. Because a cruise ship typically carries passengers from many locales, it is not unlikely that a mishap on a cruise could subject the cruise line to litigation in several different fora." 499 U.S. at 593. The same rationale applies in the instant case. HG Partnership, which was later incorporated as HGB, consisted of individual investors from more than twenty countries. It follows that because the partnership, and later the corporation, was and is involved in international transactions with its shareholders and could be subjected to litigation in a multitude of fora, it has a special interest in limiting the fora in which it could potentially be subject to suit.

In sum, the Court finds that the forum selection clause is reasonable and enforceable. The Court therefore grants HGB's motion for summary judgment as to improper venue. Because the Court has held that Bermuda is the proper venue, it need not, and more importantly should not, address the other issues raised by the parties.

## CONCLUSION

For the forgoing reasons, the Court: (1) grants in part and denies in part Plaintiff's motion to strike portions of HGI's LR 56.1 submissions [doc. no. 79-1]; (2) denies Plaintiff's motion to strike HGB's LR 56.1 submissions [66-1]; (3) denies Plaintiff's motion for summary judgment [60-1]; (4) grants HGI's summary judgment motion [54-1]; and (5) grants HGB's summary judgment motion [57-1]. This case is hereby terminated. All pending motions are dismissed as moot.

**SO ORDERED.**  **ENTER:**  3/30/04

HON. RONALD A. GUZMAN
**United States Judge**